All right. Mr. Nance. Good morning, Your Honors. May it please the Court. I'll ask you to interrupt me early and frequently because I'm not really clear on what would be the most important aspect of this case for you. As I see it, the law is established, especially the well, I think if you look at our brief, especially the certificate of interested person, that gives a pretty clear understanding of why we're here. I tried to make that clear well before the first ten pages of Roman numeral. Well, I mean, you know, you all have been in court, you know, for a while. It's been up and down on these motions. I've been on a motion panel with it. I mean, unique and indigenous to Louisiana, New Orleans in particular, that Turing Cemetery is a, you know, kind of a piece of it. So, you know, you're back and forth, you know, dealt with aspects. We carried some parts of the case. So, you know, there are two aspects, the main appeal, and then we, you know, have the denial of the injunction, etc. So, I mean, there's tons of writing. We've read all the briefing, but it doesn't mean it's all crystal clear. You've got an antitrust claim, and the contention is, well, you haven't sufficiently defined the market. If you're talking about tourism, that includes voodoo tours and swamp tours and whatever. Those are my words, as opposed to, you know, is it just cemetery tours? So, I mean, one aspect of the case, the claim is footed in antitrust. So, you know, kind of help clarify that piece. I'm not trying to tell you what to argue, but we put it down for argument because if it was crystal clear, we decided on the briefs. Thank you for the clarity. I'll address that issue. At least speaking for myself. I'll start with that. The main issue, I think, with regards to antitrust is market, relevant market definition, and when you're talking, this is an exceptional antitrust case to begin. It's the type of case that requires very cursory review to, for it to be readily apparent that there was a monopoly established. There's an email that clarifies prices will be fixed, and they have, if you look at... What is the market? Start definition. I mean, antitrust, you got to say, what do you articulate, you know, the market is? What was the antitrust restraints? Vertical? Horizontal? I mean, you know, just I'll go to a few lines to some basics here. I don't think it could be vertical because these actually are potential competitors. The archdiocese company, NOAC, New Orleans Archdiocese Cemeteries, it stepped into the tourism industry when it started in 2015, requiring that the tour guides that it required to accompany visitors share their revenue with the cemetery, with NOAC, and that lasted for about six years after COVID, and rather than renew the arrangement of having contracted tour companies and tour guides accompany visitors, which is actually kind of reasonable since they're asserting there's vandalism. We all know that vandalism occurs there. There's an article that's not in the record. I'm not sure if I could even refer to it, but it was written by the Archbishop, and he, in 2015, he said that they were making the change specifically because they believed that having more tour guides in the cemetery would help That's not the case, but there's no evidence for that. We never, they haven't filed an answer, much less have discovered. So with regards to them being horizontally aligned, the cemetery tour company stepped into the tourism industry in 2015, and when they made the change to have only one tour company, that was created a few months prior, with no tourism experience, that's when they stepped fully in to the tourism industry, and there's a side issue of whether or not Title VIII, which regulates cemeteries, even allows a cemetery tour company, an operator, they're technically called a cemetery operator, they're required to operate the cemetery for cemetery purposes and cemetery business exclusively, and I don't think that a cemetery tour has ever been considered part of a cemetery business, and to make that clear, because I don't think they covered cemetery tourism in, I mean, cemetery law in law school, it's, Title VIII allows for a company, it could be the owner of the land, it could be a separate company, to operate a cemetery. The land ownership is a separate issue. It has nothing to do with whether a cemetery is public or private, for example. That's defined by who gets to be buried there. NOAC's website makes clear that they are offering burials to people of all faiths, and I think Nicholas Cage refuses publicly to say what religion he is, but he paid half, a quarter of a million dollars to put a pyramid in St. Louis No. 1, and I don't think that he paid that much money for people to not be able to see it without paying NOAC and CTN, which I'm not going to talk about, but like I said, aside from the name, Cemetery Tours NOLA, which makes it clear that their goal is to eventually capture as much of the cemetery tourism industry in the city as possible. Let me ask you this. There was a motion to dismiss the appeal that was filed below, because it failed to state an antitrust claim. The district court granted the motion to dismiss the appeal, asserting a failure to state a claim under antitrust law, and that was appealed. We carried it with the case. First, tell us why we should reverse the district court's dismissal of the appeal, of what keeps you in court, or how is the antitrust claim made out? You understand my question? I think so. The district court granted the motion, put you out of court, then it was appealed to us. We carried it with the case, so it's here today. We dismissed the case, end of story, right? Well, I'd appeal, but we started off, our first appeal was denial of the claim. Did you ask for oral argument? I asked for oral argument. Yes, I did. Your question of why we granted oral argument seems odd, but I'm sorry. Go ahead. I don't mean to make the point that I don't think we need it. I don't know what's most important to you, and since we don't have a jury, I think you're going to lose me. You're the appellant. What I don't understand is the case is here. There's a mountain of paper here. You got poured out, not you personally, by the district court. The district court was unconvinced by all the writing that there is a viable antitrust claim. It broke reasons, and that's appealed to us. We didn't deal with it in the motion setting, but carried it with the case, even though the other side vigorously says, we don't need the rest of this. Get rid of it. I mean, I'm just kind of asking. You just seem reluctant. You're the appellant to want to argue the case. Believe me, I'm not. I'm happy to talk about it. I mean, as to why you should stay in, if we think the district court was correct to dismiss the appeal, by my eyes, you're out. Not you personally. The second appeal that we filed was when the district court dismissed our entire case and also refused to allow us to admit six affidavits, which supported our motion for preliminary injunction. Because of the timing of how that happened, the defendants have argued that our first appeal should be But they're making arguments that don't make sense to me, because when You say you didn't state a claim, and the affidavits you wanted to put in still wouldn't, and that there was a delay, and you had time, and so on and so forth. We had one hearing in court. It turned out it was intended to be an evidentiary hearing. I know the procedure, counsel. I'm trying to get you to address the main point of the question. I'm not trying to be impatient, but the procedural history is kind of here. I mean, it's a motion to dismiss, so if you don't want to say, then, of course, that's your prerogative, but the district court looked through it and ruled there was no antitrust case, so at least for me, walk me through why or how does the complaint that's filed state an antitrust claim under Twombly, under the applicable law, so that you stay in court. That's all I ask you. The district court held a legal finding that we didn't present any evidence. We were at an evidentiary hearing that was unnecessary. There was no controverted evidence, no material evidence in this case. They don't dispute the facts. Everybody agrees that up to 90% of the cemetery tourism business in the city goes to St. Louis No. 1. That's undisputed. They've captured 90%, up to 90% of the business in the city. It's focused on cemetery tours and not swamp tours, because they're forcing every visitor to that cemetery, and if it's allowed to happen at that cemetery, their argument allows it to happen at any public cemetery in the state, so it's not just visitors from out of state or some other part of the state. It's everybody that they don't recognize as a relation, and they are given exclusive right to decide who is a relation, and then those relations get to decide who is a friend of the deceased. Nobody wants that. Nobody. Everybody has friends that our family doesn't like. There are people that don't have family, which would mean no friends are allowed in. It makes no sense whatsoever. It violates the custom that goes beyond this state. Every state in this country... But why is that an antitrust violation? Because without claiming the ability to exclude everybody who doesn't pay them, they can't enact their scheme. They don't have... Immovable rights are a bundle of sticks. When the land became dedicated as a public cemetery, they lost some of the sticks, which cover access for the public at reasonable times for free to visit a cemetery. They are now claiming those sticks belong to them so that they can license exclusive access to a company they actually control. That's how this plays out. So if they don't have the right to exclude people from land that's been dedicated to the public originally by custom, then in the civil code, and we've cited the articles, articles 1, 3, 450, 455, especially the comments, they specifically say that, okay, to clarify, originally in this state, cemeteries were all public. St. Peter, which I won't get into it, St. Peter was his first city cemetery. This St. Louis No. 1 replaced it in the early, late 1700s. There was a fight over who owned the land. So when the legislature wrote Title 8 in 74, I think that the Archdiocese's institutional memory prompted them to make sure that the new legislation would clarify that they owned the land. That's fine. We don't have any issue with that. But when you change the law, which they did, by allowing someone to privately own cemetery land that had always been public because it was a cemetery, the legislature still put in Title 8 numerous references to the fact that the dedication of land to a cemetery purpose is in respect for the public's benefit. It's not so that some cemetery operator can charge a fee exclusively for access. And I understand some people might take an issue with the fact that my clients make a living giving tours, but you please remember, they are licensed by the City of New Orleans to give tours in public spaces, which includes public cemeteries, includes the cemeteries owned by the It tends to do the same thing that the Archdiocese is doing with Lafayette No. 1. There's a lot of pushback. And I guarantee you, at some point, because this is the only state where this is happening, the legislature would eventually get involved. But the executive's not involved because they've abdicated the responsibility to a cemetery board that's controlled by the industry. In fact, the manager for cemetery tours for NOAC, who manages their 13 cemeteries, is on that board. They're not going to step in and do what they should do, which is bring some sense of order to this and, more than anything, ensure the public cemeteries are accessible to the public. And I'm not saying all the time. I'm not saying we're asking for any kind of change to the law. We're actually, like I said initially, we're asking for the law to be upheld. If they were asking for a reasonable change to the law, maybe certification to the Louisiana Supreme Court would be appropriate, except that we've been waiting a year for an injunction to enforce the law, the law that's existed for over 200 years. They've taken issue with custom, for example. They cited in one filing a law article written by Gail Stevenson, Custom as a Source of Law, because the goal of the focus of that article was to say that we have so much legislation now that we really don't need to look to custom. But anybody that knows how legislation can never keep up with technology knows that legislation can never encompass everything that comes up. And death is eternal. People will always be dead. In that article, they ignored the chapter, the last chapter, titled True Custom Cases and cited two cases, one of which ensures that the custom of the state paying for a tombstone, that's a legitimate custom in that author's mind. They cited that article almost 20 times in the same filing but ignored that chapter entirely. That custom refers to death. This is the same situation. We're talking about a custom relating to death. Going back 4,000 years, I was prepared to reference the epic of Gilgameth and its description of death and why it's so important. It's for the dead and the people that are living. And it's not just for relations. It's for everybody who cares about that person. They've made the argument that because of case jurisprudence that there's very limited jurisprudence in the state on this issue, nothing specifically on the custom, but the cases do reference. The cases do reference frequently that nobody challenges the public's right to get on to a cemetery. But those cases, I'll talk about later. Thank you. All right. Thank you, sir. All right. Mr. Capitelli. Thank you, Your Honor. I may please the Court. Brian Capitelli on behalf of the New Orleans Archdiocese Cemeteries. Your Honor, this is obviously a very serious matter and I don't mean to make light of this case, but this case is about the dead and nothing, we just heard, breathed life back into it. This case is done and should be done. And the issues are crystal clear to this Court, which are there's simply two issues. First, with respect to, and I'll handle this briefly because we've split time with counsel for CTN, Your Honor, but with respect to the preliminary injunction, the district court made it very clear that the appellant failed to produce any evidence related to irreparable harm and he denied the preliminary injunction on that basis. The appellant also filed a preliminary injunction directly with this court, which this court has already denied. And then with respect to the case in its entirety, Your Honor, Your Honor, Judge Stewart, you asked the appropriate question. This is an antitrust claim. And just as the appellant failed to provide any evidence related to irreparable harm, entitling him to a preliminary injunction, the appellant also failed to define the relevant market. And the district court appropriately, Judge Bariash, appropriately dismissed the case on that relevant market issue because, as I said, we've split our time. With respect to the request for the preliminary injunction, Your Honor, I won't take up too much of the court's time, but the history of the case is such that the plaintiff was given ample opportunity to provide that. Your Honor, we had a TRO. Yeah, but what about the argument that there's no dispute of evidence, so he didn't think he needed to put on evidence? I'm not agreeing with that sentence. I'm just asking your reaction. My reaction to that, Your Honor, is I was going to get to that. I appreciate you bringing that question. We disagree with that. We filed an opposition to the motion for the request for preliminary injunction. We don't agree with a lot of his facts. What he stated is a conclusive allegations. He has not presented evidence to show that. And when it goes, I think for preliminary injunction, you need to put on evidence whether it's disputed or not, unless the other side stipulates it. That's correct, Your Honor. And just so the court is aware, we had a hearing. There was a briefing schedule. You should have a hearing. And I had I had a witness there, Your Honor. And then counsel for the appellant shows he had a witness who had COVID. Judge Ash said, if you would like to reset this, we will reset this hearing. He gave counsel ample time in light of the situation going on at the time. That witness was not allowed into the courtroom. He chose to go forward without any witnesses. Counsel, the district court, I want to say, almost begged him to continue the hearing. He chose not to. He chose not to go At that point, Your Honor, I had a witness ready as counsel defendant. It is not my burden. So obviously, I did not put on any witnesses. It doesn't put on any evidence. That's the end, right? That's and that's that's your argument here. We wouldn't even have to reach all the facts because there aren't any. There aren't any, Your Honor. It's a complaint. And counsel seems to say that as a prima facie showing and that he was entitled to an evidentiary hearing just so it's clear. And I think your honor is understand this. There was no prima facie showing of of any type of irreparable injury. Any of the factors set forth that are required a preliminary injunction by Judge Ash. Well, but what about somebody who wants to go see their friend in the cemetery but isn't allowed to? Why isn't that irreparable harm? Because that interaction with, you know, I'm not going to get into people's religion and things like that. Some people feel very strongly that they need that interaction at the grave site. And so I don't think that's a ridiculous argument that, you know, that's a problem if you're not allowed to do that. Understood. So what's your answer to that? Is that is not the plaintiffs who were before this court is the initial answer, which is as there the tour guides and as he just, yes, as counsel just saying a later case could be brought by the friend. Well, I don't think a later case will be bought by the friend, Your Honor, because the N. O. A. C. Norms Archdiocesan cemeteries has a process by which friends and family can have passes and they can achieve passes and they can go visit their loved ones as they see fit, obviously during certain hours, but do not have to pay a fee. Do not have to attend the tour. None of just to that grave site. They could go to the site and visit as your honor indicated, you know, pay respects to the loved ones in whatever manner they see. How do you prove that you were somebody's friend? Well, Your Honor, that process is not before the court and none of those plaintiffs are before this court and you're saying they could be if there is the process and it didn't work for them, they could file a suit and that would be a different suit. Yes, correct, Your Honor. There is a family and friends program that allows for certain individuals to receive access. Those are not the plaintiffs before this court. Those are not the plaintiffs who filed this lawsuit. This antitrust laws are just taking somebody came in from New Jersey and wanted to go around New Orleans and this was one of the things they wanted to do. That's your correct, Your Honor. And the point is just so the court understands. There's also a very similar lawsuit that is filed in civil district court in Orleans Parish and which we've gone through. Mr Nance is not counsel for that tour guide, but there's a very similar, almost copycat lawsuit. I'll call it which a lot of these issues have been fleshed out. Judge Nikesha Irving not did deny a preliminary injunction, but there's still issues pending before that court. A lot of the state court issues, which I'm not going to get into because I don't think it's germane to this court's decision, but related to Louisiana law, public, private, a lot of these issues that I don't think are germane to this court's decision in upholding Judge Ashes denial of the preliminary injunction and dismissal of the lawsuit. Um, and I'm happy to answer any other questions. Let me ask one thing. Yes, judge. Represent the archdiocese. It is actually the entity is the New Orleans archdiocese cemeteries, Your Honor. So it is a it is a subsidiary. So it's not the New Orleans archdiocese itself. To the archdiocese is or is not a party to this lawsuit. It is not a part of your honor because they're in bankruptcy. Well, as you just heard, I don't want to reiterate some of the bankruptcy arguments you heard earlier today. Is that is that the only question you had, Your Honor? Yeah, I was trying to figure out. You always figure that the archdiocese is running everything. If you've been a Catholic for any time, right? So I figured the archdiocese was somewhere in the picture. And your answer is they're in bankruptcy court. Yes, the entity itself is the N. O. A. C. Which I will agree with Council for appellant. They are a cemetery authority. They actually run 14 separate cemeteries in and around the New Orleans region. Are they a subsidiary of the archdiocese? Your Honor, I don't want to miss miss state what exactly the corporate structure is. All I know is they are a separate entity, Your identity is not in bankruptcy or or we would not be before the court. We would not have been in district court, at least not now. Your Honor's have any other questions for me before I turn it over? Council for C. T. N. To answer, uh, the questions with respect to the relevant market. No, I think we've got you. Thank you. Thank you. Mhm. Super. No. May it please the court. Diana Serpentine on behalf of Cemetery Tours Noah. Uh, I'd like to speak with your honors this morning about the district court's dismissal of the antitrust claims that have been alleged in this lawsuit. Uh, the district court got it right when it found that there wasn't a sufficient market that had been pled. And for that reason, this court should also affirm the district court's decision. Judge Stewart, I think you kept trying to get the plaintiff to identify what the market was. And I didn't hear it when I was sitting over there. But that is where we have to start with any sort of antitrust lawsuit. That's the upon the case, which Judge Stewart, you were in and also the shock case. Judge King, I know you were on that panel. We know from both those cases that you have to establish the relevant market and the relevant market, as your honors know, is a relevant product market as well as a relevant geographic market. And the relevant product market is going to look at what are the interchangeable substitutes as well as the degree of cross elasticity of demand when you're looking at what consumers are basically going to turn to for substitute products. In this particular case, the way that the complaint is pled is it then it goes down and says, Actually, no, it's really number one and number two, because none of the other cemeteries can offer what number one and number two offer in terms of culture, architecture, historical significance. So what the plaintiffs have essentially done in this case is that they have limited the product market. If you have a nice business, then you're an antitrust violent. Is the argument you're saying they're making? Sorry, I didn't hear the first part of your question. Well, you're a good business, then you're an antitrust violent, according to the other side, right? Yeah. And so that's your point is while we might be good that or while the that entity might be good. What? Why is that a reason to find antitrust? Correct. And it's the same way. In some of the cases, we cited the TV network system case, which was cited in the Aponte decision about, you know, a single TV TV station. We've also cited cases talking the the dome the domed hotel case or don't excuse me, dome stadium case where they wanted to restrict the market just to holiday in hotels. You can't just pick and choose what you want the market to be to fit your set of facts. And courts typically antitrust cases at the motion to dismiss state. This is the most common way they're dismissed is because the market is not appropriately pled, especially when it's artificially narrowed to a case is historical tours, and that's what the district court found. So we have to look, step back and say, Okay, if I can't go to ST Louis number one, where am I gonna go? Oh, maybe I'll go on a garden district tour. Maybe I'll go on a swamp tour. Maybe I'll go out to the to the capital. Maybe I'll go down to Louis Armstrong Park. Maybe I'll go to Congo Square. There's so many tours and other places in Louisiana or southeastern Louisiana that folks can go that aren't going to be limited to number one or number two. And for the court's reference, number two is not even operating right now. So we're really just talking about talking about number one here. And on top of that, even if you do take cemetery tours as the product market, it's still not adequate here because they have not addressed the other cemeteries in the area. You know, we have heard council just mentioned Lafayette Cemetery. That's another prominent cemetery in the area. Metairie ST Rock Holt Cemetery. There are numerous cemeteries, and none of them have been identified. And in Surgical Care Center of Hammond, another Fifth Circuit case that one of the grounds in that case said you have to identify who the competitors are, and we don't that the complaint is void of any of the who these competitors would otherwise be for for this type of product. And so we request the argument that it's a public cemetery. I mean, in our I don't believe it affects the antitrust aspect of this argument at all, regardless of whether you're a public or a private. Well, I guess I understand you're saying you're I think you're your position is that well, if it's public, maybe they can get easier access and they might not have as much access as a private. But our position is that this is not a this is not a and and this is this actually belongs to the archdiocese. And if you look at the Hodges case that we said in our brief, when event when someone owns the property, they have the ability to basically exclude who they want from that property. And that would be another basis to affirm dismissal for the district court in this particular case. And so on. And also, I don't think it makes a difference when it comes to the broader antitrust analysis is because we're looking at tours. We're not looking at just, you know, whether a cemeteries public or private, we're looking at where consumers gonna go. I mean, consumers could go to the World War Two Museum that's owned, obviously, by somebody else. But just because you're a tour guide, you can't go into the World War Two Museum, even if you know, have all the knowledge in the world about that information because they own it. It's the same thing here. No AC owns this particular cemetery and has a right to contract or do business or decide who they want to have give tours. Um, from that analogy, Disney World. Um, in terms of you can't just have people walk into Disney World and give tours. Right, right. Exactly. I mean, it's a world limit. I'm sure it does limit X, Y and Z. And it's despite it's very big and fulsome place that a lot of people go to and think is pretty unique. I agree. I agree 100%. I think definitely, you know, you have folks owning private property all over the country and they have a right to exclude or just decide who, you know, who provides the services on their property. Um, and again, just and I just want to touch again on the geographic market. Um, I also think that, you know, the geographic market, they basically again try to limit it just to number one. If you look in the Aponte case, the city of Lubbock had a contract with the water at its facilities. It had then dropped that contract and entered a new contract with Coca Cola to provide basically almost an exclusive list of beverages at at 27 different facilities, which eliminated the contract with Aponte, the bottled water manufacturer. They had 27 facilities in that case, and this court said that is not a sufficient geographic market, you know, because part of it was is that Aponte could still sell water to other folks inside and outside of the city. The same thing is true here, which we even know from the complaint. These tour guides, they're still offering tours. They're offering voodoo tours. They're offering tour walking tours of the French quarter. This just shows you that the market is not cemetery tours. It's broader tours, and that's who CTN, my client, is competing with. They're competing with other tours that are being given in the areas, and so they cannot basically gerrymander the market to exclude the other tours that are being given in the city. Likewise, you know, we've cited several other cases in our briefs where I direct the court's attention to an Eighth Circuit case, which was Double D spotting. That case is very analogous to our case. In that particular case, you had one, you had an unloading contract, an exclusive warehouse had an exclusive dealing relationship with one trucking unloading company. And in that case, the Eighth Circuit found that one unloading contract at one warehouse was not sufficient as a market, and not an unreasonable restraint on trade. And we've cited several cases in our brief that alternatively that this arrangement is not an unreasonable restraint on trade, in part because we don't have a big share of the market. I think the answer would have A, you have the market is too narrow because we're narrowing it basically to cemetery tours at number one, or the market is effectively much broader, including several tours throughout the state, and the single contract that CTN might have with the archdiocese to operate a single tour at a single cemetery is not going to restrain trade or have an economically significant effect on the market as a whole. And so for that additional reason, we submit that the plaintiffs have not met their burden at the motion to dismiss stage to plead a sufficient market. We think the district court decision should be affirmed. Let me ask you something. Does this record have anything in it about other cemeteries elsewhere? Is it all just about one and about, you know, various other cemeteries? The complaint is devoid of any other cemeteries other than number one and number two. We did raise in our briefing examples of below of other cemeteries in the area. And and there is reference to cemeteries generally with respect to the public and private argument that appellate made. But in terms of the antitrust argument and looking at specific cemeteries in the greater New Orleans area, the record has nothing on that point. Thank you. Any other questions? Thank you, Your Honor. All right, Mr. Nance, you reserved your right to rebut. Thank you, Your Honor. With regards to who is before the court, these are cemetery tour companies and guides, but they have also brought this action on behalf of their own personal interests. We have members who have relations that have not and they have not been recognized by NOAC as relations. We have people who have friends there in the most intimate sense, friends there. And we have people who care about the people that are there and know the history about the people who are buried there more than most people. And those are all being deprived of access. So it's not just tour guides trying to put on their effort to get to see Mr. X, their friend that died. Um, and they weren't allowed to. Those are in the because essentially saying that we had not presented any evidence at a hearing where and we filed our filings. I'm saying prior to that. I mean, in other words, at the preliminary injunction, you didn't put on evidence. I had evidence already. We had verified complaints that had verified. No, but what I'm at a hearing on a preliminary injunction you put on evidence you put on the person who says I had a friend who died and I wanted to go see them and these people wouldn't let me in. And I filed a letter and they said, No, you're not a friend. You've got to stay out the door. You've got to pay for a tour. We filed our filings reference cases from this circuit that say otherwise. If there are no contested material facts, then there's no reason for an evidentiary hearing. In fact, it merely wasted time while we were waiting for an injunction. What should have happened? Okay. Whether something like what I just said is not going to be an elation or whatever. They're saying they did. 90% of the business goes to one cemetery, and it's misleading when they say we talk about only that one cemetery is being the geographic market. We never said that. We said the geographic market is New Orleans. We said that the service, the relevant product or service is cemetery tours. That covers the relevant market. Always limit something enough. You could say the relative is Disney World. What are they offering? They're not offering swamp tours. They're offering cemetery tours. My reading of the case law says that you look at what? Why is that a history tour? Okay, if it's a history tour, it's a history tour at a sacred cemetery. And it goes back to the fact that I said earlier, they have not simply said tourists have to pay. Everybody going there has to pay. If they don't think that your relation, but you are, you've still got to take their tour on the path that they dictate. And if it doesn't go past the tour that you want to see, you don't get to see it despite what they've said. Also, with regard to market, cross elasticity, how do you have cross elasticity with someone who wants to go to a particular grave? Someone who wants to go to a particular cemetery? Again, these are not just people that come for swamp tours. There are people that care about cemeteries. There are people that care about the people buried there. There is no cross elasticity. That's why this case, that's another reason why this case is so exceptional. This is a case that requires minimum review because it should be obvious on its face. 90% of the business at one location, and it wasn't a good business that they had. They took the business, gave it to their own new company. They took the business from the industry. We have 76 members represented by Jordan Hobson here, and those members also have relations there. They have friends there. So this is not just about antitrust. They would not be able to enact their scheme to monopolize set prices, another fact that's not disputed, at five dollars above the maximum that was ever charged before. That's in an email from the manager of CTN, sent before our preliminary injunction hearing. These are not disputed facts. Does the diocese get some of that money? Well, in 2015, the Archbishop wrote in his article that they were going to use tour guides to protect the cemetery, and the money would go to protect and maintain the cemetery. We haven't seen any evidence of that. The affidavits that were excluded testify that that has not been a religious cemetery. So, and that, they got that passed in 74. So we don't know what happened. We've never been in discovery. No answer has been filed. If an answer were filed, most of this would obviously not be disputed because it hasn't been today. The only fact they ever tried to dispute was our assertion that no cemetery in this country does this. They referenced Christ Church burial ground in Philadelphia. I called that cemetery manager the day after the post-hearing brief. He was not aware that in 2017, the Pennsylvania Legislature, or whatever they call their assembly, passed a law entitled, it's Chapter 7 of Title 9 of their statutes, and Chapter 7 was added specifically to say an individual has essentially exclusive the right to visit any cemetery, even private cemeteries, family cemeteries. They say an individual. They don't say the relations and friends that is talked about. Oh, I apologize. You've got a red light if you want to conclude your argument. They don't, when when they talk, when they talk about friends and relations, that's coming from cases talking about access across private land to get to a secluded cemetery. St. Louis number one is you step right off the public sidewalk onto the designated walkways. There are designated entrances, walkways, roads on other cemeteries. Those are dedicated roads. I'm going to stop you there. I apologize. No apology needed. You've obviously, you know, advocate on behalf of your client. You need not apologize for that. We appreciate your argument and briefing and likewise counsel opposite. We've got the case. It'll be submitted. We'll get it appreciate it. I may say it's been an honor because I've waited 28 years since